IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.

UNITED STATES OF AMERICA,

      Petitioner,

      v.

MONICA HARRINGTON,

      Respondent.

---

## PETITION FOR PRELIMINARY INJUNCTION

---

The United States petitions for a preliminary injunction ordering Respondent Monica Harrington to transfer $2,190,271.17 into the Court's registry pending final judgment in a related case in this Court, *United States v. George Harrington*, 1:19-cv-02965-PAB-GPG. This petition is brought under the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Civil Procedure 65.

George Harrington is Monica Harrington's husband. On October 17, 2019, the United States brought the related case against George Harrington to (1) reduce to judgment $1,832,907 in civil penalties that the IRS assessed against him (plus interest and related accrued penalties), and (2) obtain an order directing Mr. Harrington to repatriate his offshore assets to pay these penalties. During a deposition in the related case, the United States recently discovered that Mr. Harrington no longer holds nominal title to these offshore assets. Rather, in approximately December 2012, Mr. Harrington purported to transfer his interest in those assets, about $2.7 million, to his wife for no consideration. This occurred soon after the IRS first contacted Mr. Harrington in September 2012 to inform him that he was under examination. Subsequently, in

1

2015, Monica Harrington transferred the funds to an account at Vontobel Holding AG in Switzerland held solely under her name.

George Harrington's purported transfer to his wife of his interest in these funds appears to have been an attempt to shield several millions of dollars from eventual collection by the United States. What's more, Mr. Harrington's domestic assets are insufficient the pay the penalties at issue. Almost all his assets lie overseas and were subject to the purported transfer to his wife. Thus, whether the United States can collect an eventual judgment against Mr. Harrington depends on obtaining access to his offshore assets.

For this reason, after discovering that Mr. Harrington had purportedly transferred these assets to his wife, the United States moved to amend the complaint in the related case. (1:19-cv-02965, ECF 43.) The proposed amendments would add Mrs. Harrington as a defendant and seek a judgment (1) finding that Mr. Harrington's transfer of the assets was fraudulent under 28 U.S.C. § 3304, and (2) directing Monica Harrington to repatriate the assets. Mr. Harrington filed an opposition to the motion on September 23, 2021. The United States intends to reply immediately.[1]

An asset-repatriation order cannot wait until a decision in the related case on the United States' motion to amend the complaint, much less a final judgment in that case. Given George and Monica Harrington's previous attempts to shield his assets from collection, and considering they now know that the United States is aware of these efforts, it is likely that Monica Harrington will transfer the assets in the Vontobel account to yet another foreign account possibly in a

---

[1] Because Monica Harrington is not yet a defendant in the related case, the United States is filing this separate action against her. The United States will move to consolidate these actions if the Court in the related case grants the motion to add Mrs. Harrington as a defendant.

nominee's name. In addition, Mrs. Harrington holds German, as well as American, citizenship. The risk exists that she would leave this country to evade enforcement of an asset-repatriation order against her. In either case, the United States would be unable to collect on a judgment against Mr. Harrington.

As further explained below, the circumstances therefore warrant a preliminary injunction ordering Monica Harrington to repatriate $2,190,271.17, which is the amount of the judgment sought against George Harrington as of September 15, 2021, and deposit that amount into the Court's registry. Such an injunction is necessary to preserve the availability of the only funds to pay a judgment and prevent irreparable injury to the United States. In addition, an injunction would not impose an undue burden on Mrs. Harrington because she would receive the funds back with interest if the United States does not obtain a judgment against Mr. Harrington or prevail on the fraudulent transfer claim. By contrast, only through this injunction can the Court ensure that the Harringtons will not place the only assets available to satisfy a judgment beyond reach. Accordingly, the balance of equities weighs in favor of granting the requested injunction.

## Jurisdiction and Venue

The Court has jurisdiction under 28 U.S.C. § 1345.

Venue is proper under 28 U.S.C. § 1391(b) because Monica Harrington resides in Grand Junction, Colorado.

## Background

### 1. The IRS's Investigation of George Harrington.

In 2012, the IRS began examining Mr. Harrington's tax returns starting with the 2005 tax year. It first contacted Mr. Harrington about the examination on September 19, 2012. (Exhibit 1, Declaration of Supervisory Revenue Agent Galo Grau, ¶ 5.) Ultimately, the IRS's examination

revealed that Mr. Harrington willfully failed to disclose that he had held an interest in millions of dollars in offshore accounts from 2007 to 2010. (*Id.* ¶ 8.)

Federal law requires every resident or citizen of the United States, who has a financial interest in, or signatory or other authority over, a bank, securities, or other financial account in a foreign country, to report that relationship to the IRS for each year in which the relationship exists. *See* 31 U.S.C. § 5314(a); 31 C.F.R. § 1010.350(a). To fulfill this requirement, U.S. residents or citizens must file with the IRS a "Report of Foreign Bank and Financial Accounts," commonly known as an "FBAR."

In this case, Mr. Harrington filed FBARs for 2005 and 2008–2010, in which he reported his interest in a foreign account in New Zealand. (Grau Decl., ¶ 3.) These filings demonstrate that Mr. Harrington was aware that he was required to file FBARs reporting his foreign accounts. Mr. Harrington, however, failed to report his interests in foreign financial accounts in Europe for 2007 through 2010. (*Id.* ¶ 8.) For that reason, on October 27, 2017, the IRS assessed willful FBAR penalties against Mr. Harrington, pursuant to 31 U.S.C. § 5321(a)(5). The IRS based the penalty determination, in part, on amended FBARs for 2007 through 2010 that Mr. Harrington filed well after they were due, in February 2014. (*Id.*) In these amended FBARs, Mr. Harrington reported, for the first time, his interests in the European accounts at issue and the balances in those accounts for each year. (*Id.* ¶ 7.)

On October 17, 2019, the United States brought the case related to this action, *United States v. George Harrington*, 1:19-cv-02965-PAB-GPG, seeking to reduce to judgment the FBAR penalties against Mr. Harrington.

**2. Facts Confirmed in Tax Court Case.**

In a Tax Court case Mr. Harrington brought to challenge related income tax assessments against him, the Tax Court issued factual findings relevant to the FBAR penalties and to this action. *See Harrington v. Comm'r*, T.C.M. (RIA) 2021-095, 2021 WL 3140384 (T.C. 2021). The Tax Court confirmed the following facts determined in the IRS's investigation.

George Harrington is a U.S. citizen. *Id.* at *1. His wife, Monica Harrington, holds dual U.S. and German citizenship. *Id.* In the 1980s, Mr. Harrington was working in the forestry industry in Newfoundland and Labrador, Canada. *Id.* There, he met a Canadian lawyer named John Glube. *Id.* In 1987, Mr. Harrington sold his house and gave Glube a check for $350,000, the bulk of the sale proceeds. The Tax Court found that Mr. Harrington "was impressed with Mr. Glube's proficiency at secreting assets in the Cayman Islands and wished to secure the same treatment for his $350,000 nest egg." *Id.* at *2. Glube deposited the check into an account at the Cayman Islands branch of Union Bank of Switzerland (UBS). *Id.* The account was under the name of a Cayman entity called Reed International Ltd. *Id.* UBS records show that Mr. and Mrs. Harrington were both named beneficial owners of the account. *Id.* The Harringtons also held assets in a Cayman account at Royal Bank of Canada (RBC), under the name Malta Ltd. *Id.* The source of the Harringtons' funds in the RBC account is unknown. By 2007, the funds in both accounts had reached over $3 million. *Id.* at *5.

That year, the two Cayman accounts were closed, and the Harringtons transferred the funds in both accounts to a Swiss UBS account under the name "Schröder Stiftung," a Lichtenstein asset-management entity. *Id.* at *2. (Schröder is another name that Mrs. Harrington goes by, and a *Stiftung* is essentially the German version of a trust.) The Harringtons were the

5

Stiftung's primary beneficiaries, while their children were its secondary beneficiaries. *Id.* The account's highest balance in 2008 was $3.2 million. *Id.* at *5.

In 2009, UBS informed the Harringtons that it was closing the Stiftung account. *Id.* at *2. Earlier that year, the U.S. Department of Justice had entered a deferred prosecution agreement with UBS in which UBS admitted aiding U.S. citizens in establishing accounts to conceal their ownership of or interest in assets. *Id.* Consequently, the Harringtons moved their assets from the Stiftung account at UBS to two life insurance policies in Lichtenstein. *Id.* at *3. They established the policies with an entity called Valor Life, naming themselves and their children as beneficiaries. *Id.* Three years later, in December 2012, the Harringtons cashed out the life insurance policies[2] and transferred the remaining funds, about $2.7 million, to an account at LGT Bank in Lichtenstein. *Id.*

The Tax Court confirmed that Mr. Harrington was aware, at the time he failed to file FBARs for his European accounts, of the duty to timely disclose these foreign accounts on an FBAR. *Id.* at *13. Nor did he initially disclose the accounts when the IRS examination began. Instead, Mr. Harrington first claimed to the examiner that he did not know where his money was and that he suspected Glube or his former business associates had stolen it. *Id.* at *14. Only after the IRS confronted Mr. Harrington with evidence of his interests in the European accounts did he file the amended FBARs reporting those interests. (Grau Decl., ¶¶ 6–7.)

**3. Additional Facts Established in Discovery in the Related FBAR Case.**

Not until the United States' counsel in the FBAR action deposed Mr. and Mrs. Harrington did Mr. Harrington disclose, and Mrs. Harrington confirm, that the two had taken

---

[2] Mr. Harrington confirmed at his deposition that the life insurance policy had a cash value. (G. Harrington Depo. 87:4–10, 93:12–94:6.) For that reason, his interest in the policy was subject to reporting on an FBAR. *See* 31 C.F.R. § 1010.350(c)(3)(ii).

steps to further conceal Mr. Harrington's ownership of the $2.7 million. In written discovery in

that action, Mr. Harrington should have disclosed, but did not, that he purportedly had

transferred his interest in those funds to his wife, who had then placed them in another foreign

account solely in her name. For instance, an interrogatory to Mr. Harrington stated:

> Identify any account at LGT Bank AG in which you and/or your wife had a financial interest. With respect to each account, state who opened the account; the account's purpose; the source of all funds placed into the account and the dates the funds were place into the account; and the accounts or other locations to which any funds were transferred from the LGT Bank account and the dates of such transfers.

Mr. Harrington answered: "Neither Defendant nor his wife had any foreign bank account

including in LGT Bank AG, other than in New Zealand during the years identified by the

Plaintiff in its FBAR action." (Exhibit 2, Response to United States' Interrogatory 11.)

During his deposition on August 12, 2021, however, Mr. Harrington stated that the LGT

account had been opened in 2013 under Monica Harrington's name only, and the entire cash

value from the life insurance policies, $2.7 million, had been transferred into it. (Exhibit 3, G.

Harrington Depo. 98:23–99:1, 102:4–103:9.) Mr. Harrington further explained that his wife had

closed the LGT account in 2015 and moved the funds to a new account at Vontobel Holding AG

in Switzerland, again solely under her name. (*Id.* 103:16–104:22.) The funds remain in the

Vontobel account. (*Id.* 104:5–9.)

In her deposition on August 19, 2021, Monica Harrington stated that she and her husband

used to own the offshore assets jointly. She claimed, however, that in December 2012, George

Harrington transferred his entire interest in the assets to her for no consideration. (Exhibit 4, M.

Harrington Depo. 34:10–12, 35:6–13.) In addition, she confirmed that in 2015, she transferred

those assets to a Vontobel account solely in her name. (*Id.* 38:16–19, 40:24–41:1.) Mrs.

Harrington also stated that she's a German citizen, her family lives in Germany, and she was

considering using the money in the Vontobel account to live there. (*Id.* 9:18–19, 31:19–32:5.)

According to records obtained from Mrs. Harrington via subpoena, as of August 31, 2021, the Vontobel account has a balance of $3.2 million. (Exhibit 5, Account Statement.) In addition, according to the information maintained by the IRS, Mr. Harrington does not have sufficient domestic assets to pay the FBAR and related penalties assessed against him, which now total $2,190,271.17. The vast majority of his assets consists of what he purportedly transferred to his wife. (Grau Decl., ¶ 10.)

As stated above, on September 7, 2021, the United States moved to amend the complaint in the FBAR action against George Harrington to add his wife Monica Harrington as a defendant. The proposed amended complaint alleges, based on the newly discovered evidence, that Mr. Harrington's purported transfer to Mrs. Harrington of his interest in the offshore funds was fraudulent and should be set aside under 28 U.S.C. § 3304. Because those funds now sit in a foreign account solely in Mrs. Harrington's name, she should be compelled to repatriate sufficient funds to pay in full the FBAR and related penalties assessed against her husband.

**Legal Standard**

Courts grant preliminary injunctions under exigent circumstances. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 (10th Cir. 2009). To obtain such relief, the moving party must satisfy four factors: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Id.* at 1208.

Preliminary injunctions come in two forms: prohibitory and mandatory. A prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, by contrast, orders a party to "take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). The latter type of

injunction requires a stronger showing "both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotation omitted).

In seeking an order directing Mrs. Harrington to transfer funds into the Court's registry, the requested injunction technically compels an affirmative act. But an order to transfer funds into the registry would nonetheless be a prohibitory, rather than mandatory, injunction. Its ultimate purpose is to prohibit the enjoined party from dispensing with the funds by essentially freezing the funds until final judgment. *See*, *e.g.*, *Coastal Labs, Inc. v. Jolly*, No. CV RDB-20-2227, 2021 WL 1599224, at *10 (D. Md. Apr. 23, 2021) (denying request to vacate preliminary injunction that had ordered defendant to transfer funds into the court's registry to cover possible judgment). In any event, the facts here warrant preliminary relief even under the heightened standard for a mandatory injunction.

## Argument

As explained below, the circumstances here satisfy each of the factors for obtaining the requested injunctive relief.

**1.     The United States Will Likely Succeed on the Merits.**

> **a.     The United States can prove that Mr. Harrington's transfer of $2.7 million to his wife was fraudulent under 28 U.S.C. § 3304.**

The Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.* grants the United States various remedies to recover debts owed to the United States, including avoiding fraudulent transfers. Under the Act, "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . with actual intent to hinder, delay, or defraud" the United States as creditor. 28 U.S.C. § 3304(b)(1). The Act

further empowers courts to void such fraudulent transfers when necessary for the United States to collect the debt owed it. *See* 28 U.S.C. § 3306(a)(1). Lastly, the Act instructs courts to consider, among other factors, 11 badges of fraud when deciding the intent-to-defraud element. These 11 badges are whether:

1. "the transfer or obligation was to an insider;"

2. "the debtor retained possession or control of the property transferred after the transfer;"

3. "the transfer or obligation was disclosed or concealed;"

4. "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;"

5. "the transfer was of substantially all the debtor's assets;"

6. "the debtor absconded;"

7. "the debtor removed or concealed assets;"

8. "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;"

9. "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;"

10. "the transfer occurred shortly before or shortly after a substantial debt was incurred;" and

11. "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

28 U.S.C. § 3304(b)(2). A court may determine that a transfer was made with the requisite intend to defraud even if not all of these badges of fraud are satisfied. *See United States v. Murphy*, No. 07 CR 853-7, 2015 WL 2445050, at *2 (N.D. Ill. May 20, 2015). Most of the badges of fraud are present here.

First, Mr. Harrington purportedly transferred the $2.7 million to an insider—his wife. *See* 28 U.S.C. § 3301(5)(A)(i) (defining "insider" to include "a relative of the debtor").

Second, Mr. Harrington concealed the purported transfer during both the IRS

examination and discovery in the subsequent civil action. As stated above, he at one point told the IRS examiner that he did not know where his offshore assets were and that he suspected the lawyer Glube or his former business associates had stolen the assets. *See Harrington*, 2021 WL 3140384, at *14. Mr. Harrington likewise failed to disclose the purported transfer in his discovery responses, even though he was specifically asked about any such transfer.

Third, Mr. Harrington made the purported transfer in December 2012, soon after the IRS first contacted him in September 2012 to notify him that he was under examination. (Grau Decl., ¶ 5.) Before then, Mr. Harrington had owned the assets jointly with his wife going back at least to 2002. *See Harrington*, 2021 WL 3140384, at *2. The timing therefore suggests that Mr. Harrington made the purported transfer to prevent the United States from collecting any monetary penalties that might result from the IRS examination.

Fifth, the $2.7 million purportedly transferred to Monica Harrington represented nearly all of Mr. Harrington's assets. (Grau Decl., ¶ 10.)

Sixth, Mr. Harrington went out of his way to hide his offshore assets even before the purported transfer. As detailed in the Tax Court opinion, Mr. Harrington kept the assets "in tax havens (the Cayman Islands and Liechtenstein) and countries known for their strict bank secrecy laws (Switzerland)." *Harrington*, 2021 WL 3140384, at *13. Mr. Harrington "repeatedly went out of his way to conceal his assets in places where he knew they would be difficult to find." *Id.* Also, as explained above, Mr. Harrington failed to report these accounts on an FBAR, even though he had filed FBARs reporting a New Zealand account during the relevant years and thus knew of the reporting requirement. *Id.*

Seventh, Mr. Harrington did not receive any consideration in exchange for purportedly relinquishing his interest in the $2.7 million. (M. Harrington Depo. 34:10–12.)

Eighth, the $2.7 million in the European accounts constituted nearly all of Mr. Harrington's assets. His domestic assets, by contrast, were far more modest. (Grau Decl., ¶ 10.) So, by transferring sole ownership of the $2.7 million to his wife, Mr. Harrington effectively rendered himself insolvent.

Finally, Mr. Harrington became liable for the civil FBAR penalties around the same time as the purported transfer. Although the penalties were not assessed until October 2017, the events leading to those penalties occurred between 2007 and 2010. Similarly, the IRS's examination resulting in the assessment began in September 2012, three months before the purported transfer. Thus, Mr. Harrington's liability for the penalties arose close in time to the purported transfer in December 2012. *See In re Wyly*, 607 B.R. 862, 873 (Bankr. N.D. Tex. 2018) (explaining that "the IRS becomes a creditor of a taxpayer on the date the obligation to pay income taxes accrues and not when the tax assessed").

Based on these facts, the United States can demonstrate that Mr. Harrington transferred the funds to Monica Harrington with actual intent to hinder, delay, or defraud the United States from collecting payment on the penalties that he knew might result from the IRS examination, and which ultimately were assessed. The United States, therefore, will likely prevail on its claim that the transfer was fraudulent and should be set aside under 28 U.S.C. §§ 3304 and 3306(a)(1).

Additionally, once the Court sets aside the fraudulent transfer, it can order Mrs. Harrington to repatriate enough funds to pay the FBAR penalties and interest in full. *See United States v. Schwarzbaum*, No. 9:18-CV-81147, 2021 WL 3540008, at *2 (S.D. Fla. June 30, 2021) (finding that, because the court had personal jurisdiction over the defendant, it could order him to repatriate foreign assets to pay a civil FBAR penalty).

**b. The United States will likely succeed in obtaining judgment on the willful FBAR penalties against Mr. Harrington.**

To obtain judgment that George Harrington willfully failed to file FBARs for 2007 through 2010, the United States must demonstrate the following:

1. Mr. Harrington was a U.S. citizen from 2007 to 2010;

2. Mr. Harrington had a financial interest in, or signatory or other authority over, a bank, securities or other financial account from 2007 to 2010;

3. The account balance exceeded $10,000 every year from 2007 to 2010;

4. The account was in a foreign country;

5. Mr. Harrington failed to timely report the account to the IRS;

6. Mr. Harrington's failure to report the account was willful; and

7. The penalty amounts were proper.

*See United States v. Hawker*, No. 2:19-CV-836 TS, 2021 WL 288566, at *2 (D. Utah Jan. 28, 2021).

The facts stated above satisfy each of these elements. First, by filing the amended FBARs for 2007 through 2010, Mr. Harrington has admitted to the first five elements and provided evidence for the seventh. In filing the amended FBARs, he conceded that the FBAR reporting requirement applies to his interests in the Swiss UBS account and Lichtenstein ValorLife policies. He obviously did not disclose those interests until well after the statutory deadline for doing so. And in the amended FBARs, he stated the balances in the accounts, on which the IRS, in part, based the penalty amounts.

Moreover, with respect to the penalty amounts, Mr. Harrington has not alleged in the FBAR case that the IRS abused its discretion when setting those amounts. Nor would such a challenge succeed in any event, considering the IRS selected penalty amounts well below the

statutory maximum. (*See* Exhibit 6, Memo from IRS Office of Chief Counsel.)

Finally, the facts indicate that Mr. Harrington's failure to file was willful. During the years at issue, Mr. Harrington knew of the FBAR reporting obligation given that he timely filed FBARs reporting his interest in a New Zealand account. Yet he did not report his interests in the European accounts until after the IRS had confronted him with its evidence. And as stated above, and as the Tax Court determined, Mr. Harrington took several steps to conceal his interest in the funds that he placed in the European accounts.

For these reasons, the United States will likely prevail on its claim that Mr. Harrington willfully failed to file FBARs for the years at issue.

**2.     The United States will likely suffer irreparable harm absent a preliminary injunction.**

Irreparable harm is "harm that cannot be compensated *after the fact* by monetary damages." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000) (emphasis added). Hence, even in a suit for money damages, the potential difficulty in collecting on a judgment can support a finding of irreparable harm. *See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

Here, the United States will likely never collect any portion of the $2,190,271.17 judgment sought in the related case unless it can do so from the funds Mr. Harrington has attempted to shield from collection by purportedly transferring them to his wife. The $3.2 million in Monica Harrington's Vontobel account include essentially all of Mr. Harrington's assets. (Grau Decl., ¶ 10.) If left where they are—an offshore account under Mrs. Harrington's control—a significant risk exists that Mrs. Harrington will place the funds out of reach. Mrs. Harrington could transfer the funds to yet another account in possibly a nominee's name, or she

could travel outside the Court's jurisdiction and otherwise expend the funds.  *See generally United States v. Barrett*, No. 10-CV-02130-RBJ-BNB, 2013 WL 5458609, at *2 (D. Colo. Aug. 13, 2013) (finding a significant risk of irreparable harm to the United States based on the likelihood that the defendants would leave the country before paying their tax debts).

As explained above, George and Monica Harrington already have taken several steps, throughout the years, to shield their offshore funds from collection. In light of their past efforts, the $3.2 million in the Vontobel account is not secure while it remains under Mrs. Harrington's unfettered control. Courts have found that a party's pattern of concealing or fraudulently transferring assets indicates the party would follow that pattern absent injunctive relief. *See Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020) (stating that "other courts have also found irreparable harm where a debtor conceals assets from its creditor"); *McGirr v. Rehme*, 891 F.3d 603, 613–14 (6th Cir. 2018) (finding irreparable harm given the defendant's pattern of attempting to dissipate assets).

For these reasons, a significant risk of irreparable harm to the United States exists and justifies the injunctive relief sought.

**3.      The balance of equities favors an injunction.**

As explained above, in the absence of an injunction, the United States will likely suffer irreparable injury. Mrs. Harrington, by contrast, is unlikely to suffer any injury if the injunction is granted. Rather, because Mr. Harrington's purported transfer to Mrs. Harrington of his interest in their offshore assets was fraudulent, the injunction would merely compel her to follow the law by, essentially, restoring his interest in those assets. Following the law does not constitute injury. *See generally United States v. TEG Rest. Grp. Inc.*, No. 21-CV-00164-RM-KLM, 2021 WL 1577711, at *2 (D. Colo. Apr. 22, 2021) ("Defendants suffer no harm from paying what they are

required to pay by law.").

Moreover, the injunction would not permanently deprive Mrs. Harrington of the funds at issue. Instead, it would merely preserve the funds in an interest-bearing account. Should the United States not prevail on the fraudulent transfer or FBAR claims against her husband, Mrs. Harrington would receive the funds back with interest. In addition, the injunction would not deprive Mrs. Harrington of all of the funds in her overseas account. During the pendency of the injunction, Mrs. Harrington would have over $1 million available to her (i.e., the value of the account, $3.2 million, less the $2.19 million subject to this injunction request).

The injunction, therefore, would impose minimal, if any, harm to Mrs. Harrington, particularly compared to the irreparable injury the United States would suffer in the absence of an injunction. The balance of equities weighs in favor of issuing the injunction. *See*, *e.g.*, *Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195, 1200–01 (10th Cir. 1992) (finding that an injunction transferring property to a court-appointed trustee imposed only minimal harm on the defendant titleholder, and the balance of equities weighed in favor of an injunction).

### 4. Ordering Mrs. Harrington to transfer $2,190,271.17 into the Court's registry is in the public interest.

Ensuring that the United States recovers payment on civil FBAR penalties is necessary to protect the public fisc. In enacting the FBAR provisions, 31 U.S.C. §§ 5321 *et seq.*, Congress contemplated that the use of "secret foreign bank account[s]" was the "largest single tax loophole permitted by American law," causing the "debilitating effect[ ]" of "hundreds of millions" of dollars in lost tax revenues. H.R. Rep. No. 91-975, at 12-13. Hence, civil FBAR penalties act "as a safeguard for the protection of revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *United States v. Est. of Schoenfeld*, 344 F. Supp. 3d 1354, 1372 (M.D. Fla. 2018) (quoting *Helvering v. Mitchell*, 303

16

U.S. 391, 401 (1938)). An injunction meant to enforce payment of these penalties would likewise serve the public interest in the "fair administration of the internal revenue laws." *United States v. RaPower-3, LLC*, 325 F. Supp. 3d 1237, 1250 (D. Utah 2018).

The injunction is also in the public interest because it is in the aid of justice. Without it, Mr. Harrington may be able to hinder enforcement of an eventual civil judgment against him in another case pending in this Court.

### Conclusion

For the foregoing reasons, the United States requests an injunction directing Monica Harrington to repatriate $2,190,271.17 and place that amount into the Court's registry pending final judgment in the related case.

DATED: September 24, 2021

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Matthew Uhalde*
CHARLES J. BUTLER
MATTHEW P. UHALDE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C.  20044
202-514-6062
202-307-0054 (Fax)
Charles.J.Butler@usdoj.gov

*Of Counsel*
MATTHEW T. KIRSCH
Acting United States Attorney

*Counsel for the United States of America*